Christina Wilds, adm'x, &c. *vs.* The Hudson River Rail Road Company.

It is the duty of a rail road company, in crossing a public street in a populous city, with its trains of cars, to exercise extreme care.

If the servants of the company, having charge of the locomotive, fail to look out, at a street crossing, so as to see the danger of a collision with a team, and avoid it in time; or if the train is under such headway that though the servants see the team, the train cannot be stopped in time, the company will be deemed guilty of negligence. Gould, J. dissented.

The measure of care which one driving a team along a street in a city, crossed by a rail road track, is required to exercise, is such care as a person of ordinary prudence would exercise in like circumstances.

If the negligence of a rail road company or its servants has put an individual in imminent peril, the company is answerable for the consequences, though such person did not exercise the soundest discretion in his efforts to escape. *Per* Peckham, J.

THIS was an action by the plaintiff, as administratrix of her deceased husband, to recover damages of the defendant for wrongfully killing him. As is usual in cases of this nature, it involves two questions : First, whether the defendant

was guilty of negligence causing the injury.    Second, whether the deceased was also guilty of negligence contributing to it. The plaintiff recovered a verdict.    Judgment was perfected, and the defendant appealed.

*T. M. North,* for the appellant.

*W. A. Beach,* for the respondent.

PECKHAM, J.    The defendant raised the questions before stated on a motion for a nonsuit, made when the plaintiff rested her case, and renewed when the evidence was closed. These are all the questions now urged for a reversal of the judgment, except a point made, but not argued, that the verdict was against evidence.    A motion was made at the circuit to set aside the verdict on the judge's notes of evidence, and was denied.

As to the first question, the negligence of the defendant. It appears by the evidence that this injury occurred on the Troy Union road, as it crossed Fourth street in the city of Troy.    It crosses that street on the same surface with the street.    The defendant's cars and all sorts of vehicles, as well as foot passengers, travel that street of right and in common. Fourth street runs nearly north and south, and the defendant's rail road runs through the city along there, nearly northeast and southwest, crossing Fourth street diagonally.    The injury occurred on or about the 6th October, 1855.    The defendant's train was moving down southwesterly, and the deceased was going north on Fourth street.    He was driving a pair of horses before a double seated pleasure wagon, with no load and no one in it but himself.    There were buildings on the easterly side of Fourth street, and on the easterly side of the rail road as it intersects Fourth street, standing quite near to the track, thus to some extent intercepting the view of the deceased up the track.

1. There was evidence that the defendant's train was going too rapidly for such a place, over a public street in a popu-

Wilds *v.* Hudson River Rail Road Company.

lous, thickly settled city. Gillespie, a witness for the plaintiff, who resided on Fourth street, testified that "the train was coming fast for that part of the track. They don't generally go fast there." He was not cross-examined on this point. T. B. Carroll, another witness for the plaintiff, testified that he could not tell how fast the cars were running at the time of the collision. "They were running very rapidly, I think. It is my impression they were running rapidly all the while. I think that before the collision my attention had been directed to the fact that they were running rapidly." He was not cross-examined. This is all the evidence on the part of the plaintiff to this point.

From the testimony of Gregory we could only infer that the train was going faster than usual, perhaps positively fast. But the testimony of Carroll shows without qualification that the train was going "very rapidly." His attention had been drawn to it. Twelve or fifteen miles an hour would scarcely be regarded as running "very rapidly," for a rail road train. He speaks wholly irrespective of locality. Certainly no one acquainted with rail road travel would say a train was running "very rapidly" when it was moving at a less rate than twenty miles the hour.

A very different rate of speed is proved by several of the employees of the defendant, and they differ a good deal among themselves. By the conductor, "about five miles an hour." The engineer says, five or six miles. The fireman, about six miles. The baggage master, six or seven miles. With all their brakes and reversing the engine they were unable to stop her until she had run some 425 to 450 feet, according to the difference in testimony as to the point where they were first applied. With such protection only against danger to human life as was here presented, I think enough was proved as to the speed of the train at this public crossing in a city thoroughfare, to carry the cause to the jury on the question of negligence in the defendant.

2. It is said it was the duty of the fireman to look out on

one side and of the engineer to look out upon the other side of the engine, with a view to avoid danger, of course. That they performed this duty, the fireman testifies. But of what possible benefit was it for them to look out, if the train was going at such a speed that it could not be checked till the injury was accomplished?

It is well settled that it was the duty of the company, at a crossing like this, to exercise extreme care; and the defendant seems driven to this alternative, either the fireman was not looking out as he ought to have been, so as to see the danger at such a place and in time to prevent the injury, or the train was under such headway that though he saw it, the train could not be stopped in time. Either side of the alternative is fatal to the defendant's claim of having used proper care.

Then was the deceased guilty of carelessness contributing to the injury? The judge at the circuit laid down the true rule as to the measure of care he was required to exercise: "Such care as a person of ordinary prudence would have exercised in like circumstances."

The deceased was a farmer living, at the time of the injury, in Grafton, about eleven miles from Troy. He had been in the habit of coming to Troy every Saturday for several years with butter and produce. He came there in that way on this occasion, which was on Saturday. There is no evidence in the case that the deceased had any knowledge of the times when trains passed over this road. In fact there is no distinct evidence that he had knowledge of any such rail road being there, or of its crossing Fourth street there. It had been in operation about a year and a half prior to this injury. The case does not disclose the track of the road through Troy. There is no impossibility, perhaps no high degree of improbability, in a farmer going to market every Saturday for a year and a half, in Troy, without knowing that this rail road crossed Fourth street near Adams. The deceased was in an empty market wagon, which generally

Wilds *v.* Hudson River Rail Road Company.

makes considerable noise, so as to close the ears of the driver in a degree to other and foreign sounds.

It appears to be quite clear, also, as a fact, and highly probable from the locality and surrounding circumstances, that it should be so, that the deceased did not see or hear the train until just as his horses were entering on the easterly track. Then, according to the testimony of Gillespie, "he turned his head and looked up—raised his whip to strike the horses." That was the first time Gillespie, who stood near there, heard the whistle. At about this time the woman, Maria Banker, shouted to him from an upper window, as she says, not to go on the track. She says this was just as the flagman went up and held the flag in front of the horses and they sheered off to the left. The flagman never did this act at all; but it shows the time, by the sheering of the horses. Orr, the defendant's witness, who was near deceased, did not hear her cry, and probably the deceased did not. About the same time O'Brien shouted to him; perhaps a little earlier. Orr says the horses of the deceased were then within about fifteen feet of the track, on a smart trot. The locomotive was then in sight, and near them; then was when they. "shied;" and the deceased straightened up the reins and struck the horses. The whole evidence shows that the horses were badly frightened. One witness says they "flared up;" another, that they pranced, &c. and made an awful plunge. The flagman was engaged with a woman, and did nothing towards notifying the deceased or keeping him off the track. As to the deceased, it was the same as if no flagman was there.

Here was a case, it will be conceded, of imminent peril to the deceased, with confusion all around him. It is comparatively easy to point out now, by the light of after-events and sitting in tranquil safety, what would have been wise for the deceased to have done then. But most men under such circumstances of instant, threatening peril, act rather from

instinct than cool judgment and calm reasoning. The law does not demand any such absurdity or impossibility as judicious and wise conduct under such circumstances. If the defendant's negligence had put him in this imminent peril, the defendant is answerable for the consequences, though the deceased did not exercise the soundest discretion in his efforts to escape. (*Collins* v. *Albany and Schenectady R. R. Co.*, 12 *Barb.* 492. 13 *Peters*, 181. *Eldridge* v. *Long Island R. R. Co.*, 1 *Sandf. S. C. R.* 89.)

But what should the deceased have done when so near to the locomotive? The defendant's counsel insists if the deceased had turned his horses to the right, up Fourth street, as he admits he could not turn them down, that a very slight bend to the right would have saved him. It clearly appears by the testimony that the horses were unused to a steam engine; one was young; that they "shied" to the left from fear of it; that they were frightened; and I think it requires but little knowledge of horses to know that it would have been nearly if not quite an impossibility to have turned them up to the right so as to nearly face a thing so alarming to animals as a fierce, rushing engine. It is obvious they stopped about still *on the track*; from alarm, cowering, "prancing" and "flaring up" from fear. Had they remained on the east track it is obvious the deceased would not have been hurt, but there is scarcely a possibility that they would have so "remained." Alarmed as they already were as the object of their terror approached nearer, they would naturally have made efforts to escape, and as animals in their instinct would seek to run away from the feared object, and not face the engine, they would have run across, as they did, or down still further to the left; either of which courses would have brought them in contact with the engine. The effort of the deceased was perhaps the most rational one to escape. It may have been unsuccessful by reason of there not being time to get across, or what is quite as likely,

Wilds *v.* Hudson River Rail Road Company.

from the horses in their alarm sheering so far to the left as
to rush against the buildings, thus leaving no room for the
engine to pass. The object and purpose that guided the
deceased in his conduct he cannot disclose. He was a slow,
steady driver. It is not pretended that this was a case of
intentional self-destruction. It was no suicide; no sane man
will pretend it. We may well infer, then, that he would
and did make such efforts as seemed to him most judicious
to save his life. I am entirely unable to say, as matter of
law, nor if a juror, as matter of fact, that 'the deceased
was guilty of negligence contributing to the injury. It
was, on this testimony, a question of fact for the jury,
and I do not feel at liberty on such evidence to disturb their
finding.

This is the third case that has been brought before this
court within the past year where death has occurred at these
public crossings. Two, at or near this same point, and another
within six miles thereof, at Bath, where the rail road track
crosses over the turnpike, and on the same surface. I have
no occasion to change the views expressed in the case of *Mc-
Grath against this road. Bernhardt* v. *The Rensselaer and
Saratoga Rail Road Co.*, reported at the same time, (19
*How*. 199,) has since been affirmed in the court of appeals.
It is entirely clear that no amount of penalty can cause
greater care in the public at these places. The only way to
save life, to prevent this continued destruction of human
beings, is to require greater care and caution from the employ-
ees of the rail road at these crossings over highways and
crowded streets. If possible to avoid it, no rail road track
should cross a public street or road on the same surface. If
they do cross, very great care should be used by the rail road
trains. The public safety imperatively demands it. It is
the peculiar business of the rail road employees to avoid
killing people at such places, and they must attend to their
business. If they will rush recklessly over these crossings,

they must take the consequences. Sound principle and enlightened public policy, in my judgment, sustain this verdict.

HOGEBOOM, J. concurred.

GOULD, J. dissented.

Judgment affirmed.

[ALBANY GENERAL TERM, March 4, 1861. *Gould, Hogeboom* and *Peckham*, Justices.]